**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

ADRIAN JOSE MEDINA-GUTIERREZ, §
*Petitioner* §
§
§
v. § Case No. SA-26-CA-03347-XR
§
DIRECTOR, SOUTH TEXAS §
IMMIGRATION PROCESSING CENTER, §
FIELD OFFICE DIRECTOR, U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT SAN ANTONIO,
DIRECTOR, U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT,
ATTORNEY GENERAL OF THE
UNITED STATES,
*Respondents*

## ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

On this date, the Court considered Adrian Jose Medina-Gutierrez's *pro se* Petition for a Writ of Habeas Corpus (ECF No. 1) and the Federal Respondents' Response (ECF No. 4). After careful consideration, the petition is **GRANTED**.

1. Respondents are **DIRECTED** to **RELEASE** Petitioner (A241-987-962) from custody, under conditions no more restrictive than those in place before the detention at issue in this case, to a public place by **June 5, 2026**;

2. If Petitioner is re-detained, all applicable procedures must be followed, including that Petitioner be afforded a bond hearing; and

3. Respondents shall **FILE** a status report on **June 8, 2026**, confirming that Petitioner has been released under conditions of release no more restrictive than those in place prior to the detention at issue in this case.

## FACTUAL BACKGROUND

Petitioner, a native and citizen of Venezuela, is currently detained at the South Texas ICE Processing Center in Pearsall, Texas. ECF No. 4 at 4. Petitioner last entered the United States without inspection in August 2022. ECF No. 4 at 4. Following Petitioner's entry to the United States, he was detained, placed in full removal proceedings pursuant to 8 U.S.C. Section 1229a, and released into the country. ECF No. 4 at 4.

On March 25, 2026, Petitioner was arrested and detained without a bond hearing. ECF No. 4 at 4; ECF No. 1 at 2; *see also* ECF No. 4 at 13–11 (arguing that Petitioner is not entitled to a bond hearing).

Petitioner filed a habeas petition asserting that his detention violates the Immigration and Nationality Act ("INA") and his due process rights. *See* ECF No. 1.

## LEGAL STANDARD

The Constitution guarantees that the writ of habeas corpus is "available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004). This protection applies to immigration-related detention. *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001).

A habeas petitioner must show they are "in custody in violation of the Constitution or laws or treaties of the United States." *Villanueva v. Tate*, No. CV H-25-3364, 2025 WL 2774610, at *4 (S.D. Tex. Sept. 26, 2025) (quoting 28 U.S.C. § 2241(c)(3)). "[B]ecause the habeas proceeding is civil in nature, the petitioner must satisfy his burden of proof by a preponderance of the evidence." *Id.* (citing *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011) and *Bruce v. Estelle*, 536 F.2d 1051, 1058 (5th Cir. 1976)). "A court considering a

2

habeas petition must 'determine the facts, and dispose of the matter as law and justice require.'" *Id.* (quoting 28 U.S.C. § 2243).

**SUBJECT MATTER JURISDICTION**

Federal courts possess jurisdiction under 28 U.S.C. § 2241 to order the release of any person held in custody of the United States in violation of federal law or the Constitution. 28 U.S.C. § 2241(c); *Vieira v. De Anda-Ybarra*, No. EP-25-CV-432-DB, 2025 WL 2937880, at *4 (W.D. Tex. Oct. 16, 2025).

**I.      The INA does not deprive the Court of jurisdiction over challenges to detention**

In previous cases before this Court, Respondents have argued that several provisions of the INA divest the Court of jurisdiction to consider habeas petitions challenging detention. *See, e.g.*, *Granados v. Noem*, No. SA-25-CA-1464-XR, 2025 WL 3296314, at *1–4 (W.D. Tex. Nov. 26, 2025). But the Court found each of the jurisdiction-stripping provisions cited by the government to be inapposite. For example, 8 U.S.C. §§ 1252(g) and (b)(9) deprive the Court of jurisdiction to consider challenges to *removal proceedings*, not challenges to *detention*. *See id.* at *1–3. Similarly, 8 U.S.C. § 1225(b)(4), which addresses challenges by immigration officer*s* to *favorable* admissions decisions, has nothing to do with detention. *See id.* at *3. Finally, 8 U.S.C. § 1226(e) bars judicial review of *discretionary* detention decisions, not *mandatory* detention under Section 1225(b). *See id.* at *3–4.

**II.     Failure to exhaust administrative remedies does not defeat jurisdiction**

While persons seeking habeas relief typically must first exhaust available administrative remedies, *Hinojosa v. Horn*, 896 F.3d 305, 314 (5th Cir. 2018), the exhaustion requirement in the immigration detention context is likely prudential rather than jurisdictional, *Calderon Lopez v. Lyons*, No. 1:25-CV-226-H, 2026 WL 44683, at *1 (N.D. Tex. Jan. 7, 2026).

Recent district court decisions have found that exhaustion would be "an exercise in futility" where the Board of Immigration Appeals ("BIA") has recently issued binding precedent adverse to the petitioner's statutory claim, such that there is little prospect the BIA would reconsider its position. *Id.* Additionally, multiple courts have held there is no further requirement to exhaust administrative remedies when challenging detention procedures on constitutional grounds. *Lopez-Arevelo v. Ripa*, 801 F. Supp. 3d 668, 681 (W.D. Tex. 2025); *Hernandez-Fernandez v. Lyons*, No. 5:25-CV-773-JKP, 2025 WL 2976923, at *7 (W.D. Tex. Oct. 21, 2025).

## DISCUSSION

Petitioner filed a habeas petition asserting that his detention violates the Immigration and Nationality Act ("INA") and his due process rights. *See* ECF No. 1.

## I.    Statutory Framework for Immigration-Related Detention

Relevant here, the INA prescribes two forms of detention for noncitizens in removal proceedings—mandatory detention under 8 U.S.C. § 1225(b) and discretionary detention under 8 U.S.C. § 1226(a). Noncitizens subject to discretionary detention under Section 1226(a) are entitled to a bond hearing at the outset of their detention. *See* 8 C.F.R. §§ 1003.19(a), 1236.1(d).

Respondents contend that Petitioner is an alien who has not been admitted and so is an applicant for admission. 8 U.S.C. § 1225(a)(1). Accordingly, Petitioner is subject to mandatory detention under Section 1225(b)(2)(A).  Noncitizens detained under this provision may be released only through the Department of Homeland Security's ("DHS") exercise of its parole authority under 8 U.S.C. § 1182(d)(5)(A).

Release from initial detention—whether under Section 1226(a) or 1182(d)(5)(A)—can be granted only based on individualized findings that the noncitizen represents neither a flight risk

nor a danger to the community. *See* 8 C.F.R. § 241.4(e) (criteria for discretionary release under Section 1226(a) include a determination that the noncitizen "is not likely to pose a threat to the community following release" and "does not pose a significant risk of flight if released"); 8 C.F.R. § 212.5(b) (parole is "justified *only* on a *case-by-case basis* for 'urgent humanitarian reasons' or 'significant public benefit,' provided the aliens present *neither a security risk nor a risk of absconding*") (emphasis added).

Thus, every noncitizen who has been paroled or released into the interior of the country has been found by a government official to pose neither a security risk nor a flight risk. Moreover, the statutes and regulations governing immigration and removal proceedings afford important procedural safeguards to such noncitizens. *See United States v. Caceres*, 440 U.S. 741, 760 (1979); 8 C.F.R. § 241.4(l)(2) (procedures for revoking noncitizen's supervised release); 8 C.F.R. § 212.5(e)(2)(i) (procedures for terminating parole).

## II.      The Government's Interpretation of Section 1225

As the Supreme Court has explained, Section 1225 "applies primarily to aliens seeking entry into the United States." *Jennings v. Rodriguez*, 583 U.S. 281, 297 (2018). Section 1226, on the other hand, has historically been understood to "appl[y] to aliens already present in the United States." *Jennings*, 583 U.S. at 303. For nearly three decades, Respondents consistently considered noncitizens present in the United States without having been admitted or paroled as being detained under 8 U.S.C. § 1226(a) and thus entitled to bond hearings.[1]

In July 2025, Respondents adopted an interpretation that noncitizens who are present in the United States without admission or parole are ineligible for bond hearings. Todd Lyons,

---

[1] *See, e.g.*, Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997) (stating that "[d]espite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination").

Acting Director of ICE, issued an internal memorandum (the "Lyons Memo") explaining that the agency had "revisited its legal position" and "determined that [Section 1225] of the [INA], rather than [Section 1226], is the applicable immigration detention authority for all applicants for admission." *Martinez v. Hyde*, 792 F. Supp. 3d 211, 217–18 (D. Mass. 2025). The BIA then adopted this position in *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216, 220 (BIA 2025), holding that all noncitizens who entered the country without inspection are subject to mandatory detention without a bond hearing under 8 U.S.C. § 1225(b).

## III.    Effect of Fifth Circuit's Ruling in *Buenrostro-Mendez*

In February 2026, the Fifth Circuit foreclosed statutory challenges to detention under Respondents' interpretation of Section 1225.[2] *See Buenrostro-Mendez v. Bondi*, No. 25-20496, 2026 WL 323330, at *8 (5th Cir. Feb. 6, 2026).

*Buenrostro-Mendez* did not reach the due process question, however.[3] Instead, the case was remanded to the district court "for further proceedings consistent with this opinion," not for dismissal. *Id.* at *10. Those further proceedings presumably will address Buenrostro-Mendez's due process claim, which the district court declined to reach in the first instance. *Buenrostro-Mendez v. Bondi*, No. 25-cv-3726, 2025 WL 2886346, at *3 n.4 (S.D. Tex. Oct. 7, 2025).

---

[2] To the extent that Petitioner seeks relief under a statutory challenge foreclosed by *Buenrostro-Mendez*, those claims are dismissed. *Buenrostro-Mendez v. Bondi*, No. 25-20496, 2026 WL 323330, at *8 (5th Cir. Feb. 6, 2026). Moreover, because the Court grants the Petition on procedural due process grounds, the Court need not reach Petitioner's challenge to detention under the Administrative Procedure Act, over which the Court likely lacks jurisdiction in the first place. *See Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011) (concluding that federal courts lack subject matter jurisdiction over APA claims where there is no final agency action); *Bhatia v. United States*, No. 16-cv-11, 2016 WL 6127799, at *2 (S.D. Miss. Sept. 19, 2016), *report and recommendation adopted*, 2016 WL 6126666 (Oct. 20, 2016) ("Detention pending a decision on removal is not a final agency action.").

[3] During oral argument, Government counsel stated: "We have one issue before the Court now: the statutory question . . . . There's not, in other words, a due process claim here." Oral Argument, *Buenrostro-Mendez v. Bondi*, No. 25-20496, at 44:56-45:11 (5th Cir. Feb. 3, 2026). This concession confirms that constitutional claims remained unaddressed by the Fifth Circuit's opinion. Thus, Respondents' contention that *Buenrostro-Mendez* "rejected" Petitioner's claim that his detention "violates the United States Constitution," *Morales v. Thompson*, No. SA-26-cv-870-XR (W.D. Tex. Feb. 23, 2026), ECF No. 6 at 5, is incorrect.

Multiple district courts within the Fifth Circuit have held that *Buenrostro-Mendez* has no bearing on whether habeas petitioners are being detained in violation of their constitutional right to procedural due process. *Marceau v. Noem*, No. 3:26-cv-237-KC, 2026 WL 368953, at *2 (W.D. Tex. Feb. 9, 2026). At least one district court granted an immigration detainee's habeas claim days after the *Buenrostro-Mendez* decision, stating: "*Buenrostro-Mendez* does not change this case's outcome on procedural due process grounds." *Hassen v. Noem*, No. 3:26-cv-48-DB, at *4 n.1 (W.D. Tex. Feb. 9, 2026), ECF No. 8; *accord Ochoa v. Vergara*, No. 1:26-CV-266-RP, 2026 WL 482211, at *1 (W.D. Tex. Feb. 20, 2026); *Azua-Zuniga v. Bondi*, No. 1:26-CV-287-RP, 2026 WL 482453, at *3 (W.D. Tex. Feb. 20, 2026); *Aleska Jamaly Bonilla Conforme v. De Anda-Ybarra*, No. EP-26-CV-263-KC, 2026 WL 381110, at *1–2 (W.D. Tex. Feb. 11, 2026).

In this Court's view, recent cases (and government arguments) rejecting due process challenges to detention based on the text of Section 1225 rely on circular reasoning. *See, e.g.*, *Lopez Jaimes v. Lyons*, No. 5:26-CV-686-MA, 2026 WL 475298, at *2 (W.D. Tex. Feb. 17, 2026) ("[T]his Court is following the mandate of Congress in Section 1225 that 'applicants for admission' shall be detained."); *Morales v. Thompson*, No. SA-26-cv-870-XR (W.D. Tex. Feb. 23, 2026), ECF No. 6 at 2–3 (suggesting that *Buenrostro-Mendez* forecloses due process challenges to detention under Section 1225 because "whether Petitioner is a flight risk or a danger is irrelevant to the statutory scheme").[4]

Petitioner's claim is *constitutional*, not statutory, in nature. "Legislation cannot detract from the privilege afforded by the constitution." *See Counselman v. Hitchcock*, 142 U.S. 547,

---

[4] *See also Resendiz v. Noem*, No. 4:25-CV-5940, 2026 WL 445497, at *3 (S.D. Tex. Feb. 17, 2026) ("[T]he government's past practice has little to do with the statute's text. The text says what it says, regardless of the decisions of prior Administrations.") (quoting *Buenrostro-Mendez*, 2026 WL 323330 at *8); *Zhuang v. Bondi*, No. 1:25-CV-201-CMS, 2026 WL 352872, at *5 (E.D. Mo. Feb. 9, 2026) ("[T]his Court is following the mandate of Congress in Section 1225 that 'applicants for admission' shall be detained."); *D.M.R.D. v. Andrews*, No. 1:26-CV-81-WBS-CSK, 2026 WL 353405, at *6 (E.D. Cal. Feb. 9, 2026) ("[B]ecause 8 U.S.C. § 1225(b)(1)(B)(ii) does not 'say[ ] anything whatsoever about bond hearings,' petitioner is not entitled to one").

565 (1892), *overruled on other grounds by Kastigar v. United States*, 406 U.S. 441 (1972). Thus, "once it is determined that the due process clause applies, the question remains what process is due. The answer to that question is not to be found in the . . . statute." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985).

Here, the Supreme Court's ruling in *Jennings v. Rodriguez* is instructive. Respondents cite *Jennings* for the proposition that "[d]etention is mandatory, so [applicants for admission] are not entitled to bond hearings." ECF No. 5-2 at 2 (citing 583 U.S. at 297, 300). As a matter of statutory construction, that is true. *See Jennings*, 583 U.S. at 297–301, 312 (holding that the mandatory detention statutes, § 1225(b) and § 1226(a), did not impose a six-month detention limitation or require periodic bond hearings). "But the [*Jennings*] Court expressly left open the constitutional due process question and remanded the case with instructions that the lower courts consider the constitutional issue in the first instance." *Santiago v. Noem*, No. EP-25-CV-361-KC, 2025 WL 2792588, at *7 (W.D. Tex. Oct. 2, 2025) (citing *Jennings*, 583 U.S. at 312 ("Consistent with our role as 'a court of review, not of first view'" "we do not reach" "respondents' constitutional arguments on their merits.") (citations omitted)). Four years later, attorneys for the Government conceded before the Supreme Court "that as-applied constitutional challenges remain available to address 'exceptional' cases" in the context of immigration detention. *Johnson v. Arteaga-Martinez*, 596 U.S. 573, 583 (2022). And the Court again declined to consider the constitutional questions, electing to "leave them for the lower courts to consider in the first instance." *Id.* (citing *Jennings*, 583 U.S. at 312).

In response to Petitioner's due process challenge, Respondents have, in similar cases, largely relied on the distinction between procedural due process claims and substantive due process claims. *See Morales*, No. SA-26-cv-870-XR, ECF No. 6 at 3, 12–20. Respondents argue

that Petitioner cannot establish a procedural due process claim because his request for a bond hearing is immaterial to Section 1225(b), which mandates his detention as an "applicant for admission," whether or not he is a flight risk or danger to the community. *Id.* at 3 (citing *Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 9 (2003) ("Plaintiffs who assert a right to a hearing under the Due Process Clause must show that the facts they seek to establish in that hearing are relevant under the statutory scheme.")). While "it is sometimes helpful, as a matter of doctrine, to distinguish between substantive and procedural due process, the two concepts are not mutually exclusive, and their protections often overlap." *Albright v. Oliver*, 510 U.S. 266, 302 (1994) (citation omitted) (Souter, J., concurring).

In the context of procedural due process, the Supreme Court has repeatedly affirmed that "[w]hen protected interests are implicated, the right to some kind of prior hearing is paramount." *Bd. of Regents v. Roth*, 408 U.S. 564, 569–70 (1972); *accord Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 848 (1977) ("It is true that before a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing, except for extraordinary situations . . . ." (citation modified)); *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 624 (1974) ("[Procedural due process] requires that any such deprivation be accompanied by minimum procedural safeguards, including some form of notice and a hearing."); *Lopez-Arevelo*, 801 F. Supp. 3d at 685 ("The essence of procedural due process is that a person risking a serious loss be given notice and an opportunity to be heard in a meaningful manner and at a meaningful time.").

IV.    **Due Process Rights of Noncitizens Under the *Mathews v. Eldridge* Factors**

The Due Process Clause prohibits the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const., amend. V. The Supreme Court has

emphasized that "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.

The Supreme Court "has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his *application*, for the power to *admit or exclude* aliens is a sovereign prerogative." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) (emphasis added). Because the Fifth Amendment entitles all "persons" to due process of law, however, noncitizens are entitled to challenge the legality of their *detention* through habeas corpus. *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025); *Boumediene v. Bush*, 553 U.S. 723, 771 (2008); *Demore v. Kim*, 538 U.S. 510, 523 (2003).

"Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). "Consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Id.* (quoting *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895 (1961)). In *Mathews v. Eldridge*, the United States Supreme Court set forth three factors for courts to consider in resolving due process challenges to procedures that would deprive an individual of his life, liberty, or property:

(1)    the private interest that will be affected by the official action;

(2)    the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and

(3)    the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

10

*Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976); *Lopez-Arevelo*, 801 F. Supp. 3d at 685.

**A.     *Thuraissigiam* does not preclude Petitioner's challenge to detention**

The government seeks to justify Petitioner's pre-removal detention based on *Department of Homeland Security v. Thuraissigiam*'s "entry fiction," arguing that, as "applicants for admission" under Section 1225, noncitizens never formally admitted to the United States lack all constitutional due process rights beyond those provided by statute. 591 U.S. 103, 107, 140 (2020).

In *Thuraissigiam*, the Court confirmed that a noncitizen "at the threshold of initial entry" "has only those rights regarding *admission* that Congress has provided by statute." *Id.* at 107, 140 (emphasis added). There, a noncitizen who had been detained twenty-five yards into the United States, just after entering the country, challenged his expedited removal. He argued that due process required "judicial review of his allegedly flawed credible-fear proceeding." *Id.* at 138.

Rejecting Thuraissigiam's claim that he was entitled to greater process in his *removal proceedings*, the Supreme Court explained that noncitizens "who arrive at ports of entry [or are detained shortly after unlawful entry]—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border.'" *Id.* at 139–40. Relying on this so-called "entry fiction," some courts have held that continuous detention of noncitizens apprehended at or near the border, including asylum seekers, does not violate the due process clause. *See, e.g.*, *Petgrave v. Aleman*, 529 F. Supp. 3d 665, 668 (S.D. Tex. 2021).

But contrary to Respondents' argument, "*Thuraissigiam* does not foreclose [Petitioner's] due process claims" here, for at least two reasons. *Hernandez-Fernandez*, 2025 WL 2976923, at

*7; *see also Lopez-Arevelo*, 801 F. Supp. 3d at 682 (identifying "two key points of distinction [from] *Thuraissigiam*" in challenge to detention under novel interpretation of Section 1225(b)).

### 1.    Removal vs. Detention

First, unlike the petitioner in *Thuraissigiam*, Petitioner here does not challenge the admission process in any way or assert a right to remain in the United States. Rather, Petitioner "merely seeks a chance to apply for release . . . [and] [n]othing in *Thuraissigiam* suggests [he] lacks such a due process right."[5] *Hernandez-Fernandez*, 2025 WL 2976923, at *8.

The distinction between removal and detention—the very basis for this Court's jurisdiction over Petitioner's claims here—is clear. Not all who are detained will ultimately be removable. *See, e.g.*, *Zadvydas*, 533 U.S. at 687 (detention of noncitizen subject to final order of removal may violate due process).

To be sure, the "entry fiction" outlined in *Thuraissigiam* limits the process regarding legal *admission* available to noncitizens detained at the border throughout their removal proceedings, whether they are paroled into the interior or not. But *Thuraissigiam* and most of the cases on which it relied considered due process challenges to *admissibility* determinations. *See, e.g.*, *Kaplan v. Tod*, 267 U.S. 228 (1925) ("feeble-minded" alien detained as a minor at Ellis Island, released to the custody of a welfare agency and later her father, had not become a *naturalized citizen*); *Leng May Ma v. Barber*, 357 U.S. 185, 186 (1958) (noncitizen who had previously been paroled was not eligible for a *stay of deportation* based on fear of government persecution in her home country).

---

[5] In fact, as one district court has noted, "the Supreme Court has not addressed the viability of constitutional due process challenges to mandatory immigration *detention*—even for those who are considered arriving aliens, and thus applicants for admission." *Santiago v. Noem*, No. EP-25-CV-361-KC, 2025 WL 2792588, at *8 (W.D. Tex. Oct. 2, 2025) ("Just this year, *Thuraissigiam* notwithstanding, the Supreme Court reaffirmed in broad terms that '[i]t is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings." *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)).

12

Indeed, if Thuraissigiam himself had been granted the relief he sought in that case—an opportunity to challenge the government's credible fear finding—there is no guarantee that he would have been released from detention. *See Thuraissigiam*, 591 U.S. at 111 (explaining that arriving applicants must be detained pending a credible fear determination and, if found not to have credible fear, *may* be detained "until removed") (emphasis added) (citing 8 U.S.C. § 1225(b)(1)(B)). Rather, "[f]or purposes of his application for admission, Thuraissigiam had already received his due process through the credible fear interview and was subject to immediate removal and deportation thereafter. It was in this context that the Court determined that 'an alien in [his] position has only those rights *regarding admission* that Congress has provided by statute.'" *Santiago*, 2025 WL 2792588, at *7 (quoting *Thuraissigiam*, 591 U.S. at 140 (emphasis added)).

### 2.    Time and Place of Detention

A "second key point of distinction is that Thuraissigiam was stopped by Border Patrol 'within twenty-five yards of the border,' immediately detained, and never released." *Hernandez-Fernandez*, 2025 WL 2976923, at *8. For constitutional purposes, Petitioner's substantial presence in the United States differentiates him from the petitioner in *Thuraissigiam* because the Due Process Clause grants protection to "all persons within the territory of the United States," *Wong Wing v. United States*, 163 U.S. 228, 238 (1896), and "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990). *Thuraissigiam*'s own language indicates that this distinction is material. *See Thuraissigiam*, 591 U.S. at 138 ("[A]s to foreigners who have never been naturalized, *nor acquired any domicile or residence within the United States*, nor even been admitted into the

13

country pursuant to law, the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law." (quotations omitted) (emphasis added)).[6] As the Supreme Court has confirmed, the constitutional analysis (i.e., the process due) depends, in part, on where and when a noncitizen is detained:

> The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law. It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders. But **once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all "persons" within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.**

*Zadvydas*, 533 U.S. at 693 (citations omitted) (emphasis added).

Noncitizens may establish substantial presence in the United States based on (1) their entry into the United States without inspection or (2) the government's parole or release of the detainee into the interior after their initial apprehension. Noncitizens who have lived with relative freedom in the United States for extended periods—unlike those detained in immigration processing centers at the border—cannot reasonably be deemed never to have been "here."

---

[6] *Shaughnessy v. United States ex rel. Mezei*, on which *Thuraissigiam* relies, involved a petitioner who was "permanently excluded from the United States on security grounds but stranded . . . on Ellis Island because other countries w[ould] not take him back." 345 U.S. 206, 207 (1953). The petitioner was excluded from the country and "indefinitely detained" on Ellis Island. *Zadvydas*, 533 U.S. at 692. The *Mezei* Court applied the entry fiction, such that the petitioner was "treated as if stopped at the border." *Mezei*, 345 U.S. at 213, 215. And "both th[e] Court's rejection of Mezei's challenge to the procedures by which he was deemed excludable and its rejection of his challenge *to continued detention* rested upon" the fact that he was treated "as if stopped at the border." *Zadvydas*, 533 U.S. at 693–94 (emphasis added). So in *Mezei*, the Court seemingly applied the entry fiction to the petitioner's detention.

But *Mezei* presents a special case, because the petitioner's detention and his exclusion were unusually intertwined. As noted above, the petitioner was detained on Ellis Island, and no other country would take him. Unlike a noncitizen entering on land, the petitioner could not have been "turned back at the border." *Mezei*, 345 U.S. at 215. The United States could not have effectuated his exclusion at all if he could not be kept on Ellis Island. Further, the petitioner in *Mezei* was excluded on security grounds, so his being allowed into the interior despite his formal exclusion would have "nullifie[d] the very purpose of the exclusion proceeding." *Id.* at 216. Ultimately, the *Mezei* Court spoke primarily in terms of "exclusion." *See, e.g.*, *id.* at 215–16 (discussing the petitioner's "continued exclusion on Ellis Island"). So even though that case technically upheld a petitioner's detention based on the entry fiction, it was ultimately about admissibility. Its effect on detention was incidental and based on the particular facts of that case.

*Rincon v. Hyde*, No. CV 25-12633-BEM, 2025 WL 3122784, at *7 (D. Mass. Nov. 7, 2025); *cf.* 8 C.F.R. § 241.4(*l*)(2) (procedural requirements for revoking noncitizen's supervised release); 8 C.F.R. § 212.5(e)(2)(i) (procedures for terminating parole). And to erase a noncitizen's years-long presence in the country "is, in essence, to erase his rights." *Rincon*, 2025 WL 3122784, at *7. Thus, for noncitizens who have entered or otherwise been released into the interior and established a substantial presence in the United States, the "entry fiction" applicable to their *removal proceedings* gives way to their interest in freedom from detention under *Mathews v. Eldridge*.

Recent decisions have consistently found that all three *Mathews* factors support the position that detaining aliens with substantial United States presence without any individualized assessment of flight risk and dangerousness deprives them of their constitutional right to procedural due process. *See, e.g.*, *Hernandez-Fernandez*, 2025 WL 2976923, at *10; *Lopez-Arevelo*, 801 F. Supp. 3d at 687; *Ngu v. Olson*, No. CV 26-10-DLB, 2026 WL 370947, at *9 (E.D. Ky. Feb. 10, 2026). This represents a growing consensus that *Thuraissigiam*'s limitation on due process rights applies only to aliens at the threshold of initial entry, not to those who have established a substantial presence in the country.[7] *See Azua-Zuniga*, 2026 WL 482453, at *3 ("Federal district courts in Texas have likewise found that similar instances of detention violated a Petitioner's right to procedural due process.") (collecting cases).

The territorial application of due process rights can have seemingly perverse consequences in that it affords greater protections to noncitizens who entered the country illegally than to those seeking lawful admission at the border. But "government intrusions have

---

[7] It is in light of this growing consensus—as well as further consideration of the applicable law—that this Court departs from its holdings in *Canales-Melgar v. Noem*, No. SA-25-cv-1571-XR, and *Goguev v. Noem*, No. SA-25-cv-1593-XR, in which it held that the "entry fiction" applies to the detention of certain noncitizens with substantial presence in the country.

15

always been tolerated at the border that would be intolerable in the interior, for the obvious reason that citizens and noncitizens alike expect to be able to go about their business [in the interior] without having to show that they are 'clearly and beyond doubt entitled to be admitted' if taken, or mistaken, for an otherwise inadmissible noncitizen." *Buenrostro-Mendez*, 2026 WL 323330, at *18 (Douglas, J., dissenting) (quoting 8 U.S.C. § 1225(b)(2)).

## B.    Constitutional Limits of Civil Detention

"[G]overnment detention violates th[e] [Due Process] Clause unless the detention is ordered in a criminal proceeding with adequate procedural protections . . . or, in certain special and 'narrow' nonpunitive 'circumstances,' where a special justification, such as harm-threatening mental illness, outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Vieira*, 2025 WL 2937880, at *4 (quoting *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997)).

To ensure that such a special justification exists, our immigration law has long recognized that noncitizens have an interest in an individualized hearing prior to detention in connection with immigration proceedings. *See Yamataya v. Fisher*, 189 U.S. 86, 101 (1903). Moreover, "[t]he Supreme Court has been unambiguous that executive detention orders, which occur without the procedural protections required in courts of law, call for the most searching review." *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020) (citing *Boumediene*, 553 U.S. at 771); *see also Zadvydas*, 533 U.S. at 692 (recognizing that "the Constitution may well preclude granting an administrative body the unreviewable authority to make determinations implicating fundamental rights" (citation and quotation marks omitted)).

16

### 1.    Civil detention cannot be punitive

The Supreme Court held more than a century ago that civil detention of a removable noncitizen violates the Constitution if it is punitive. *Wong Wing*, 163 U.S. at 237–38. "A due process violation occurs when detention becomes punitive rather than regulatory, meaning there is no regulatory purpose that can rationally be assigned to the detention or the detention appears excessive in relation to its regulatory purpose." *United States v. Torres*, 995 F.3d 695, 708 (9th Cir. 2021); *see also Seling v. Young*, 531 U.S. 250, 265 (2001) ("[D]ue process requires that the conditions and duration of confinement . . . bear some reasonable relation to the purpose for which persons are committed").[8]

The government has generally identified two regulatory goals justifying civil immigration detention: "ensuring the appearance of aliens at future immigration proceedings" and "preventing danger to the community." *Zadvydas*, 533 U.S. at 690; *see also Demore*, 538 U.S. at 531–32 (Kennedy, J., concurring) ("Were there to be an unreasonable delay . . . in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for *other reasons*." (emphasis added)).

Civil detention is punitive if it "become[s] a 'mechanism for retribution or general deterrence.'" *Kansas v. Crane*, 534 U.S. 407, 412 (2002) (quoting *Kansas v. Hendricks*, 521 U.S. 346, 372 (1997) (Kennedy, J., concurring)); *see also Hendricks*, 521 U.S. at 373 ("[R]etribution

---

[8] Although Petitioner has not asserted a due process claim challenging the conditions of confinement, the Court observes that civil detention becomes punitive (and thus unconstitutional) when the conditions of detention are too harsh. People detained under civil process or accused but not convicted of a crime "cannot be subjected to conditions that 'amount to punishment.'" *See Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). Thus, they are "entitled to more considerate treatment than . . . criminally detained counterparts." *Id.* Accordingly, when a detainee "is confined in conditions identical to, similar to, or more restrictive than, those in which . . . criminal counterparts are held," courts "presume that the detainee is being subjected to 'punishment.'" *Id.*

and general deterrence are reserved for the criminal system alone."). Thus, the Court should consider whether the class of individuals subject to detention might be "deterred by the threat of confinement." *Hendricks*, 521 U.S. at 373 (individuals subject to civil detention under challenged statute were unlikely to be deterred by the threat of confinement because they were, by definition, suffering from a "mental abnormality" or "personality disorder" that prevented them from exercising adequate control over their behavior).

### 2.    The government must comply with its procedures for revoking release

The statutes and regulations governing immigration and removal proceedings afford important procedural safeguards to detainees paroled or otherwise released into the interior. *See United States v. Caceres*, 440 U.S. 741, 760 (1979); 8 C.F.R. § 241.4(l)(2) (procedures for revoking noncitizen's supervised release); 8 C.F.R. § 212.5(e)(2)(i) (procedures for terminating parole). Individuals who have been conditionally released from detention have a protected interest in their "continued liberty." *Young v. Harper*, 520 U.S. 143, 147 (1997). This is true even when the released individual is subject to extensive conditions of release.[9] *Id.* at 148; *see also Morrissey*, 408 U.S. at 482.

For re-detention to be constitutional, the government must have complied with both the applicable statutory provisions and its own regulations. *Caceres*, 440 U.S. at 760 (when federal regulations afford individual rights and protections, the Supreme Court has insisted on requiring an agency's compliance with its own regulations). "Multiple courts have held that the government's failure to follow its own immigration regulations may warrant the release of a

---

[9] The government presumably takes the position that these noncitizens should never have been released in the first place. But accepting that as true, even an erroneously conferred benefit can create a constitutionally protected property interest where there was reason to rely on it. *Cf. Hollis v. Lynch*, 121 F. Supp. 3d 617, 643 (N.D. Tex. 2015), *aff'd*, 827 F.3d 436 (5th Cir. 2016) (ATF's prompt rescission of the mistaken approval *precluded* any reliance argument). Together, the government's 30-year interpretation of 8 U.S.C. § 1225(b)(2), the grant of conditional release, and noncitizens' compliance with the terms of such release while building their lives in this country, represent substantial reliance interests that support the existence of a due process right here.

18

detained noncitizen." *Villanueva*, 2025 WL 2774610, at *7 (collecting cases); *see also id.* ("The government's position that it can choose, based on a change in administration, not to comply with its own regulations is unprecedented.").[10]

### C.    *Demore* does not preclude Petitioner's due process challenge to detention

The Supreme Court's decision in *Demore v. Kim* does not preclude noncitizens who, like Petitioner, have established a substantial presence in the United States from challenging their detention under Section 1225(b). 538 U.S. 510 (2003).

Indeed, *Demore* itself did not preclude *as-applied* due process challenges to detention by the "limited class of deportable aliens—including those convicted of an aggravated felony"— subject to mandatory detention under the INA provision at issue in that case, 8 U.S.C. § 1226(c). *See id.* at 531–32 (Kennedy, J., concurring) (noting that even mandatory immigration detention may offend due process if removal proceedings become so unreasonably prolonged that detention no longer "facilitate[s] deportation . . . [or] protect[s] against risk of flight or dangerousness").[11]

---

[10] "Under deeply rooted principles of administrative law, not to mention common sense, government agencies are generally required to follow their own regulations." *Villanueva*, 2025 WL 2774610, at *7 (quoting *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020)); *see also Gulf States Mfrs., Inc. v. Nat'l Lab. Relations Bd.*, 579 F.2d 1298, 1308 (5th Cir. 1978) ("It is well settled that an Executive Agency of the Government is bound by its own regulations, which have the force and effect of law, and the failure of an agency to follow its regulations renders its decision invalid."); *Gov't of Canal Zone v. Brooks*, 427 F.2d 346, 347 (5th Cir. 1970) (per curiam) ("It is equally well established that it is a denial of due process for any government agency to fail to follow its own regulations providing for procedural safeguards to persons involved in adjudicative processes before it.").

[11] Since *Demore*, several courts have held that the Fifth Amendment prohibits unreasonably prolonged detention of a criminal alien under Section 1226(c) without a bond hearing. *See Black v. Decker*, 103 F.4th 133, 159 (2d Cir. 2024); *German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203 (3d Cir. 2020) (detention of criminal alien for more than two-and-a-half years pending removal was unreasonable and due process required a bond hearing justifying further detention); *but see Wekesa v. U.S. Att'y*, No. 22-10260, 2022 WL 17175818 (5th Cir. Nov. 22, 2022), *cert. denied*, 143 S. Ct. 2666 (2023) (denying criminal alien's due process challenge to continued detention under 8 U.S.C. § 1226(c) without an individualized bond hearing); *Banyee v. Garland*, 115 F.4th 928, 931 (8th Cir. 2024) (same); *Meme v. Immigr. & Customs Enf't*, No. EP-23-CV-233-DB, 2023 WL 6319298, at *4 (W.D. Tex. Sept. 27, 2023) (same); *Rimtobaye v. Castro*, No. SA-23-CV-1529-FB, 2024 WL 5375786 (W.D. Tex. Oct. 29, 2024), *report and recommendation adopted*, 2025 WL 377722, at *1 (Jan. 31, 2025) (same).

The *Demore* petitioner had been convicted of at least one aggravated felony "following the full procedural protections our criminal justice system offers." *Id.* at 513. He did not "dispute the validity of his prior convictions" or "the INS' conclusion that he [was] subject to mandatory detention under § 1226(c)" and "conced[ed] that he was deportable." *Id.* at 513–14. Instead, he argued that "his detention under § 1226(c) violated due process because the INS had made no determination that he posed either a danger to society or a flight risk." *Id.* at 514.

The Court rejected this facial challenge to Section 1226(c) based on the Government's representation that detention lasted between one-and-a-half and five months. 538 U.S. at 529–30. In upholding the constitutionality of such a "brief" detention without an individualized bond hearing, the Supreme Court recognized Congress's "justifiabl[e] concern[s]" with respect to evasion and recidivism for that *particular class* of imminently deportable, criminal noncitizens addressed in Section 1226(c). *Id.* at 518–21. These concerns were based on detailed Congressional findings that "one of the major causes of the INS' failure to remove deportable criminal aliens was the agency's failure to detain those aliens during their deportation proceedings." *Id.* at 519 ("more than 20% of deportable criminal aliens failed to appear for their removal hearings"); *see also* S. REP. 104-48, 3 (noting that a "great majority of criminal aliens, upon completing their [prison] sentences, are released from custody without being deported"). Thus, the Court held that Congress could provide for a "brief" period of mandatory detention for that "narrow" class. *See id.* at 513, 526 (quoting *Reno v. Flores*, 507 U.S. 292, 313 (1993)); *see also Carlson v. Landon*, 342 U.S. 524, 543 (1952) (concluding that denial of bail to noncitizens who admitted that they were deportable as members of the Communist Party was permissible "by reference to the legislative scheme to eradicate the evils of Communist activity").

---

Unlike cases challenging admittedly mandatory detention as constitutionally *prolonged*, this case addresses whether a detention without bond of noncitizens with a substantial presence in the United States offends due process at the *outset*. Still, the potential length of a noncitizen's detention bears on the gravity of an erroneous deprivation.

Congress has not made similar findings justifying mandatory detention under Section 1225(b) of the class at issue here—noncitizens without any criminal history who have established a substantial presence in the United States. As one court explained:

> Here, no similar logic applies. Petitioner has not been convicted of any crime. And Respondents offer no "justifiabl[e] concern[ ]" that Congress might have sought to address by providing for his unbailable detention. Detention under section 1226(c), as approved in *Demore*, is based on "personal activity," demonstrated by a criminal conviction, that rationally supports at least a prima facie finding of detention's reasonableness in light of apparent removability. No such presumptions hold in a case, like Petitioner's, where deportability is neither conceded nor obvious and where the only rationale for mandatory detention appears to be Respondents' asserted authority to withhold generally available due-process protections based on Petitioner's immigration status.

*Rincon*, 2025 WL 3122784, at *8 (citations omitted).[12]

In the same vein, in considering *Demore*'s application to this case, it's worth noting two additional distinctions between the class of criminal aliens subject to mandatory detention under Section 1226(c) and those detained under Section 1225(b).

First, "process concerns" as to mandatory detention under Section 1226(c) are somewhat mitigated not only by class-specific Congressional findings but by the robust procedural protections afforded in the underlying criminal matter. And, conceptually, the convictions themselves may stand in for the individualized determination that might otherwise be taken up at a bond hearing, by demonstrating either that the noncitizen is a danger to the community or a flight risk, depending on the crime at issue.

Second, even in passing Section 1226(c), Congress did not apply its new detention policy retroactively to criminal aliens. Instead, it (1) deferred Section 1226(c)'s implementation for two years after its enactment; and (2) clarified that the policy applied only prospectively (to those

---

[12] Indeed, not only did Congress fail to include any factual findings that would justify mandatory detention of all non-citizens who entered without inspection under Section 1225(b), but, assuming Congress had that intent, it remained remarkably silent for the 30-year period in which DHS was acting unlawfully.

released from prison after the effective date). *Mitchell v. Orsino*, No. 09CIV7029(PGG), 2009 WL 2474709, at \*1 (S.D.N.Y. Aug. 13, 2009). In the meantime, detention was governed by Section 303(b)(3), otherwise known as the Transition Period Custody Rules ("TPCR"). *Id.* The TPCR provided for individualized bond hearings for some aliens deportable for having committed certain crimes; the immigration judge could set bond after finding that the alien was not a danger to the community and was likely to appear for future proceedings. *Id.*

The built-in delay and transitional procedures suggest that noncitizens who have already been released into the interior under some pre-existing authority—but might otherwise be detained based on a change in policy—should be afforded the process to which they would have been entitled *before* the policy change.

## V.    Application of the *Mathews* Factors

Having established that Petitioner is entitled to due process protections, "the question remains what process is due." *Morrissey*, 408 U.S. at 481. The *Mathews* factors guide this analysis.

### A.    Petitioner's private interest in being free from detention is strong

As to the first element of the *Mathews* test, "[t]he private interest at stake here is substantial, arguably the most important one there is." *Rincon*, 2025 WL 3122784, at \*9. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.

"The Supreme Court has repeatedly affirmed that '[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.'" *Hernandez-Lara v. Lyons*, 10 F.4th 19, 27 (1st Cir. 2021) (citing *United States v. Salerno*, 481 U.S. 739, 755

(1987)). "For this reason, 'civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protections.'" *Id.* (emphasis in original) (quoting *Addington v. Texas*, 441 U.S. 418, 425 (1979)). Thus, the first factor weighs heavily in favor of relief.

### B.     The risk of erroneous deprivation is high

Under the second *Mathews* factor, the Court considers "whether the challenged procedure creates a risk of erroneous deprivation of individuals' private rights and the degree to which alternative procedures could ameliorate these risks." *Lopez-Arevelo*, 801 F. Supp. 3d at 686 (quotation marks omitted).

Our immigration law has long recognized that noncitizens have an interest in an individualized hearing prior to detention in connection with immigration proceedings. *See Yamataya*, 189 U.S. at 101. And the Supreme Court has required individualized hearings for deprivations of interests less fundamental than Petitioner's interest in freedom from detention. *See Goldberg v. Kelly*, 397 U.S. 254, 268 (1970) (requiring an individualized hearing prior to the termination of welfare benefits).

Here, the risk of an erroneous deprivation of Petitioner's rights is high. Without an individualized hearing, there is substantial risk that noncitizens with a substantial presence in the United States who pose neither flight risk nor danger to the community will be detained. An individualized assessment before an immigration judge substantially reduces this risk. *Cf. Demore*, 538 U.S. at 531–32 (Kennedy, J., concurring) (reasoning that "due process requires individualized procedures to ensure there is at least some merit to the" charge and detention).

An individualized analysis ensures the purpose of detention is not punitive. And, unlike mandatory detentions under Section 1226(c), there are no Congressional (or even executive) findings that those subject to "mandatory" detention under the government's reading of Section

23

1225(b) are more likely, as a class, to present a flight or security risk than any other group of noncitizens.

In short, to satisfy the requirements of due process, Petitioner, as a noncitizen who has established a substantial presence in the United States, is entitled to individualized findings justifying his detention.

### C. The government's burden does not outweigh Petitioner's interests

Finally, the burden imposed on the government does not outweigh Petitioner's interests. "To be sure, the government has a weighty interest in removing deportable noncitizens, ensuring compliance with Orders of Supervision, and protecting the public." *Villanueva*, 2025 WL 2774610, at *11. But those interests would be adequately served through individualized bond hearings or other detention proceedings that assess flight risk and dangerousness on a case-by-case basis. Respondents make no meaningful representation that the burden of providing this additional increment of process is beyond their ability. Instead, they only maintain that due process does not require it. Because the Court finds to the contrary, Petitioner is entitled to relief.

One district court described the relative risks as follows:

> [I]f this court has gotten the law wrong, its error will have resulted in a handful of immigrants being allowed to remain free from detention on bond pending a final decision in their removal proceedings after a determination that they do not pose a flight risk or a danger to the community—in other words, a result that merely extends the status quo from the past three decades. If, however, other courts eventually determine that it is DHS who has gotten the law wrong, then the agency will have unlawfully detained tens of thousands, if not hundreds of thousands, of people.

*Carbajal v. Wimmer*, No. 2:26-cv-00093, 2026 WL 353510, at *8 (C.D. Utah Feb. 9, 2026).

In sum, because Petitioner is a person who had established a substantial presence in the United States before his detention, he possesses Fifth Amendment due process rights requiring

an individualized hearing justifying his detention. The *Mathews v. Eldridge* balancing test supports this conclusion.

## VI.    Scope of Relief

Turning to relief, in habeas cases where the Court finds an ongoing detention unlawful, "the typical remedy for such detention is, of course, release." *Munaf v. Geren*, 553 U.S. 674, 693 (2008). "In recent months, courts across the country have ordered the release of detainees in similar situations." *Moctezuma v. Henkey*, No. 1:25-CV-741-BLW, 2026 WL 18809, at *5 (D. Idaho Jan. 2, 2026) (ordering immediate release and collecting cases across jurisdictions); *Cruz-Reyes v. Bondi*, No. 5:26-CV-60, —— F. Supp. 3d ——, 2026 WL 332315, at *13 (S.D. Tex. Feb. 3, 2026) ("[D]ue process concerns weigh heavily in favor of granting immediate release."); *Santiago*, 2025 WL 2792588, at *13−14 (collecting cases and finding that "immediate release appropriately remedies Respondents' violation of [Petitioner's] due process rights through her continued detention.").

To be sure, requiring a bond hearing would be a logical remedy, given that Courts have identified procedural, not substantive, due process violations. *Lopez-Arevelo*, 801 F. Supp. 3d at 687–88 (noting that the "comfortable majority position—both historically and in recent weeks—is to . . . require a bond hearing before an [immigration judge]"). Nonetheless, given Respondents' consistent position before this Court that "[t]he only relief available to Petitioner through habeas is release from custody," *see, e.g.*, *Granados*, 2025 WL 3296314, *7, the Court will order release instead. *Cruz-Reyes*, 2026 WL 332315, at *5.

And the Court agrees that bond hearings are "no substitute for the requirement that ICE engage in a deliberative process prior to, or contemporaneous with, the initial decision to strip a person of the freedom that lies at the heart of the Due Process Clause." *Cruz-Reyes*, 2026 WL

332315, at *5 (quotation marks omitted). "The suggestion that government agents may sweep up any person they wish without consideration of dangerousness or flight risk, so long as the person will, at some unknown future date, be allowed to ask some other official for his or her release, offends the ordered system of liberty that is the pillar of the Fifth Amendment." *Gonzalez v. Joyce*, No. 25 Civ. 8250 (AT), 2025 WL 2961626, at *5 (S.D.N.Y. Oct. 19, 2025). Further, in cases of re-detention of a noncitizen in violation of the Fifth Amendment, "a post-deprivation bond hearing before a DHS officer or even an immigration judge would provide no genuine opportunity to relief because the detention without adequate pre-deprivation procedures has already been carried out." *Rodriguez-Acurio v. Almodovar*, ___ F. Supp. 3d ___, ___, No. 2:25-CV-6065 (NJC), 2025 WL 3314420, at *31 (E.D.N.Y. Nov. 28, 2025).

In the event that Respondents seek to re-detain Petitioner at a future date, however, they must, at a minimum, afford him a bond hearing that accords with the requirements of due process.

Petitioner requests attorney's fees under the Equal Access to Justice Act ("EAJA"). 28 U.S.C. § 2412(d)(1)(A). Because fees under the EAJA are not available in habeas corpus proceedings like this one, that request is denied. *Barco v. Witte*, 65 F.4th 782 (5th Cir. 2023).

## CONCLUSION

For the foregoing reasons, the Petition for Habeas Corpus (ECF No. 1) is **GRANTED,** and Respondents are **DIRECTED** to release Petitioner in accordance with the parameters set forth on the first page of this order.

A final judgment will follow pursuant to Rule 58.

It is so **ORDERED**.

**SIGNED** this June 3, 2026.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE